IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

|  |  |  |
|---|---|---|
| EVELYN RUFFIN, | * | |
| PLAINTIFF, | * | |
| | * | |
| v. | * | CASE NO.: PWG-11-2469 |
| | * | |
| JACOB LEW, | * | |
| SECRETARY OF THE TREASURY, | * | |
| DEFENDANT. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION AND ORDER

Plaintiff Evelyn Ruffin, an African-American female, claims that her employer, the United States Department of the Treasury – Internal Revenue Service,[1] discriminated against her, subjected her to a hostile workplace, and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*  Compl. ¶¶ 1, 4, ECF No. 1.[2] I must determine whether either of the parties' cross-motions for summary judgment is meritorious.[3]

---

[1] Timothy F. Geithner was Secretary of the Treasury at the time Plaintiff filed her Complaint. Jacob Lew is the current Secretary of the Treasury.  *See* http://www.treasury.gov /about/Pages/Secretary.aspx; ECF Nos. 1, 64, 70.  Given that Defendant's more-recent filings appear under Lew's name, *e.g.*, ECF Nos. 80, 89, 90, 95, 103, the docket shall be updated to reflect this change. *See* 42 U.S.C. § 2000e-16(c) (stating that "the head of the department, agency or unit, as appropriate, shall be the defendant" in a civil action filed by an individual who is "aggrieved by the final disposition of his [administrative] complaint").  The Court approved the parties' stipulation of dismissal of all claims against the individual defendants that Plaintiff originally named, as well as Count I for violation of 42 U.S.C. § 1981).  Order, ECF No. 19.

[2] Plaintiff, who was represented by counsel when she filed her Complaint, has acted *pro se* in moving for summary judgment and opposing the Government's motion for summary judgment.

[3] The parties' motions are fully briefed.  *See* ECF Nos. 86, 90, 90-1, 97, 97-1 & 103. Plaintiff also filed an Amendment to Motion in Response to Defendant's Motion to Dismiss or Summary Judgment, ECF No. 101.

Because the material facts are not disputed and Defendant is entitled to judgment as a matter of law, I will grant Defendant's motion and deny Plaintiff's motion. This Memorandum Opinion and Order disposes of ECF Nos. 86 and 90.

## I.  BACKGROUND[4]

In 2004, Plaintiff worked for the IRS as an information technology ("IT") specialist, "supervis[ing] and oversee[ing] the computer information technology related aspects" of the database for "Equal Employment Opportunity ('EEO') related information" ("EEODB") that the IRS was developing. In this capacity, Plaintiff used software called Visual Powerfiles "to compile, evaluate, and report" the EEO information. The IRS licensed the software from a company called TechSolutions, Inc. Employees from STG, Inc., a contractor for the IRS, also worked on developing the EEODB. Compl. ¶¶ 23–30; Def.'s Mem. 1–2.

"The Treasury Department sought to develop an in-house alternative" to Visual Powerfiles. Compl. ¶ 28; Def.'s Mem. 2. Plaintiff and Al Green,[5] who was responsible for the contract with TechSolutions and also worked on the EEODB development, "request[ed] access to the encrypted Visual Powerfiles data model . . . to reduce the time needed to complete the EEODB project." Compl. ¶¶ 31, 33; Def.'s Mem. 6; Dec. 21, 2004 Email Chain ("Email Chain A"), Def.s' Mem. Ex. 28, ECF No. 90-28; Dec. 20, 2004–Jan. 3, 2005 Email Chain ("Email Chain B"), Def.'s Mem. Ex. 30, ECF No. 90-30. Specifically, they sought Visual Powerfiles's "table relationship diagram," but TechSolutions informed them that "[t]he table relationship

---

[4] When considering cross-motions for summary judgment, the court must consider each motion individually and view "the facts relevant to each ... in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

[5] Plaintiff's co-worker's name has been changed to protect the confidentiality of his personal information. *See* Mot. to Seal, ECF No. 89.

diagram . . . would contain information that is proprietary to TechSolutions as it would reveal the logic used to create [their] reports," and therefore TechSolutions could not "give it to the IRS under [the] current contract vehicle."  Email Chain B.  Ruffin sent Green an email on January 3, 2005 with her "thoughts on how to justify [the table relationship diagram] as a deliverable."  *Id.* She wrote:

1. Tell [TechSolutions owner Robert Patterson] that we want to verify his reports are drawing from the appropriate data. We cannot do this unless we now [sic] the structure of the tables. This verification is required for the new MD [Management Direct] 715 reports going to OPM.

2. The information will be used for recertification as well. Tell him security is requesting recertification.

3. What is written in the contract? Is there a clause for proprietary exclusion of the database tables[?]

*Id.*  Plaintiff states that, when TechSolutions would not share the diagram, she then "sought to create her own data model in connection with IRS owned data tables," but not "to engage in reverse engineering in connection with Visual Powerfiles' source codes and data models." Compl. ¶ 35.

In February 2005, Patterson filed a complaint against the IRS, alleging that, through Plaintiff, Green, and another employee, the IRS "'procured the benefits of a source code license without purchasing the license.'"  Compl. ¶ 36; Def.'s Mem. 2–3.  The Treasury Inspector General for Tax Administration ("TIGTA") investigated the matter from February 2, 2005 to January 11, 2007 and then issued a Report of Investigation ("ROI").  Compl. ¶¶ 36, 39, 45; ROI 147, 152, Def.'s Mem. Ex 3, ECF No. 90-5.[6]  Plaintiff was interviewed on February 7, 2006 and

---

[6] Defendant's Exhibit 3, which includes the actual ROI as well as its supporting exhibits, has Bates stamps in the center and to the right of the bottom of each page. The report itself and the exhibits are cited as "ROI."  The numbers cited herein are the numbers to the right of the bottom of each page.  It is unclear whether the entire file was attached, as the first page is a cover page that is titled "Report of Investigation," but the numbering begins at 146.

January 11, 2007.   ROI 688–93, 771–73.   She admitted that she "requested the [Visual Powerfiles] source code from TechSolutions." *Id.* at 657.   She first said that obtaining the Visual Powerfiles "table relationship diagrams would have reduced the number of EEODB development hours" and that obtaining the diagrams was "the only thing that would save time on the project," but then said that "the table relationship diagrams were needed for security certification of the new web based EEODB." *Id.* at 157, 657, 691.   Yet she also said that "because there was a certification already in place they were going to use that one," suggesting that the diagrams were not necessary for certification. *Id.* at 691–92.   Plaintiff stated that the language she used in her January 3, 2005 email to Green was for him "to use in his discussions with the [Visual Powerfiles] contracting officer and not for use in his discussions with the [Visual Powerfiles] contractor." *Id.* at 691.   The TIGTA agent reviewing the relevant records concluded that Green and Ruffin "were attempting to circumvent standard . . . security certification procedures by having the existing [Visual Powerfiles] . . . security certification transferred to the EEODB," even though they "knew before they asked for the source code" that the Visual Powerfiles "security certification could not be transferred to a new system." *Id.* at 657. Additionally, Jonathan Marr, an STG contractor interviewed in the investigation, "said that the [Visual Powerfiles] table relationship diagrams, schemas and code have no impact on the security certification of the EEODB." *Id.* at 155.

---

Additionally, various files appear both within the ROI and as Defendant's and Plaintiff's stand-alone exhibits.  I reference only one cite for each duplicated document.  Also, as Plaintiff's exhibits to her Opposition, ECF No. 97-2, were not numbered, I cite instead to Defendant's numbered exhibits where a document appears in both parties' filings.  When I cite to Plaintiff's exhibits, I provide a title and the general cite, "Pl.'s Opp'n Ex."

Plaintiff often cites "Ruffin Testimony" or "ROI [page number]" to support her allegations.  Yet, she did not attach her deposition testimony or the ROI to her Motion, Opposition or Amendment, and she does not provide page numbers for her testimony.  I have referred to the pages of the deposition testimony and the ROI that Defendant attached, where Defendant attached the relevant page and I was able to locate the information Plaintiff cited.

The investigation also addressed the allegation that, in "allow[ing] unauthorized access to the [Visual Powerfiles] database," Plaintiff "allowed unauthorized persons to access confidential and Privacy Act information on IRS and TIGTA employees."  ROI 153.  Ruffin admitted that Green "did give her 'live' [actual] data on a disk that she kept in a desk drawer," and that STG "received the live data," but she insisted that Green gave STG "dummy data" and that neither she nor Green gave live data to STG.  *Id.* at 692.  Indeed, the minutes to the October 4, 2004 meeting of those involved in the EEODB development state that, "[t]o address concerns about contractors having access to sensitive employee data, [Al Green] will develop 'dummy data' for the contractors to use while developing the system."  Oct. 4, 2004 Mtg. Minutes, Pl.'s Opp'n Ex. Additionally, on December 6, 2004, Green sent an email that he had "completed . . . a CD with over seventy thousand of dummy data."  Dec. 6, 2004 Email, Pl.'s Opp'n Ex.  And, on August 4, 2005, Green sent an email stating that they "need to be looking at populating the database with real data," suggesting that he had not provided actual data prior to that date.  Aug. 4, 2005 Email, Pl.'s Opp'n Ex.

After the TIGTA interviewed Ruffin on February 7, 2006, "allegations of suspected criminal misconduct by RUFFIN were referred to the Computer Crimes and Intellectual Property Division (CCIPS), Department of Justice (DOJ) for review."  ROI 771.  On December 22, 2006, CCIPS informed the TIGTA that it "declined criminal prosecution of RUFFIN for intellectual property theft, conspiracy, criminal copyright violation, and false statements made during her February 7, 2006 interview."  *Id.* at 766–67, 771.

According to Defendant, the TIGTA found that Patterson's "allegations [were] confirmed."  Def.'s Mem. 8.  According to Plaintiff, the TIGTA "issued no charges against Plaintiff and found that Plaintiff had not engaged in any wrongdoing."  Compl. ¶ 47.  In fact, the

ROI concluded that "[i]nquiries conducted and evidence obtained during the course of th[e] investigation substantiated that RUFFIN allowed unauthorized access to the [Visual Powerfiles] database and in doing so, allowed unauthorized persons to access confidential and Privacy Act information on IRS employees," and that "RUFFIN conspired with other IRS staff in efforts to obtain [Visual Powerfiles] source code for STG developers to use in the development of the competitive product," which were "violation[s] of the Treasury Standards of Ethical Conduct and the Privacy Act." ROI 153. The ROI stated that documents on Ruffin's hard drive demonstrated that the EEODB developers "intended to include various Visual Powerfiles for EEO . . . reports in the new EEODB," and those reports included TechSolutions's proprietary information. *Id.* at 253–55. The ROI also stated that, while Ruffin maintained that she gave STG "dummy data," not "live" Treasury personnel data, for use in working on the EEODB, Ruffin had a disk of actual personnel data and STG received actual data, including employee Social Security numbers. *Id.* at 692, 744–45. The TIGTA then referred the ROI to the IRS on February 26, 2007, noting that the DOJ had "declined criminal prosecution for violations of the United States Code." *Id.* at 151.

Meanwhile, in late 2006, the IT departments at the IRS had been restructured; Plaintiff began to work with Melvin Hayes as her supervisor; and her "former responsibilities . . . were given to Mitch Chaz[a]n . . . at the IRS office in Austin, Texas." Compl. ¶¶ 40–41. She claims that, "[i]mmediately thereafter, Mr. Hayes subjected Plaintiff to a hostile work environment on account of her race and gender," *id.* ¶ 41, in response to which Plaintiff filed an EEO claim in November 2006 and was assigned to a different supervisor, *id.* ¶ 42; Pl.'s Ans. to Interrogs. 9, Def.'s Mem. Ex. 40, ECF No. 90-40. She also claims that soon afterwards, "Mr. Chaz[a]n repeatedly sent Plaintiff inappropriate emails of a harassing nature" that "contained false

accusations that Plaintiff failed at her job performance." Compl. ¶ 43.  Plaintiff filed a second EEO claim in December 2006 with regard to Mr. Chazan's actions.  *Id.* ¶ 44; Jan. 11, 2007 Email, Pl.'s Opp'n Ex. (from EEO Counselor to Chazan, referencing Ruffin's Dec. 14, 2006 EEO claim); *see* Pl.'s Ans. to Interrogs. 9.

After receiving the ROI in February 2007, the Treasury Department considered whether to pursue any administrative action.  Aug. 16, 2007 Notice of Proposed Suspension, Def.'s Mem. Ex. 11, ECF No. 90-13.  Six months later, on August 16, 2007, Plaintiff's second-level manager Cecil Hua recommended a five-day suspension of Ruffin based on the ROI, for (1) allowing unauthorized individuals to access IRS employees' confidential information rather than dummy data; (2) improperly using the Visual Powerfiles database to develop the EEODB; and (3) aiding Green in attempting to obtain TechSolutions's proprietary information. *Id.*; Oct. 3, 2007 Notice of Proposed Suspension, Def.'s Mem. Ex. 12, ECF No. 90-14; Compl. ¶ 47.

In response, Plaintiff contacted an EEO counselor on September 27, 2007.  Compl. ¶ 11; Ruffin Dep. 30, Def.'s Mem. Ex. 1, ECF No. 90-3;[7] EEO Counseling Report, Def.'s Mem. Ex. 13, ECF No. 90-15. She filed an EEO claim on December 31, 2007, "alleging retaliation for the previous EEO filings; the non-selection of the G-15 position, . . . based on pre-selection and on account of Plaintiff's race."  Compl. ¶¶ 13, 48; Dep't of Treas. Ltrs. to Ruffin re Dec. 31, 2007 EEO Claim, Def.'s Mem. Exs. 23 & 24, ECF Nos. 90-23 & 90-24.[8]

---

[7] Citations to Ruffin's deposition testimony are to her March 21, 2014 deposition, unless otherwise noted.

[8] Although Defendant refers to this EEO claim as Plaintiff's "September 2007 EEO complaint," Def.'s Mem. 31, it is clear from the exhibits Defendant attached, including two letters from the Department of the Treasury to Ruffin, that Plaintiff filed her EEO claim on December 31, 2007. Dep't of Treas. Ltrs. to Ruffin re Dec. 31, 2007 EEO Claim.

On February 7, 2008, Michael C. Griffin, Deputy Associate Chief Information Officer, sustained Hua's first and third reasons for the suspension but not the second, and reduced Plaintiff's suspension to two days.  Notice of Suspension, Def.'s Mem. Ex. 18, ECF No. 90-18; Griffin Decl. ¶ 3 & Att. A, Def.'s Mem. Ex. 36, ECF No. 90-36; Compl. ¶ 50. He did not find that Plaintiff provided actual employee data "to outside contractor employees," but concluded that, regardless, she was "careless" and "failed to adequately protect employee personal information."  Griffin Decl. Att. A, at 112-13.  He also found that Plaintiff "supported efforts to utilize proprietary source code and data schemas despite IRS policies . . . and vigorous TechSolutions resistance."  *Id.* at 114. In Ruffin's view, she was suspended "on account of her race . . . an[d] color . . . and in retaliation for her EEO filings."  Compl. ¶ 51.

Plaintiff claims that, after the suspension, she "was subjected to continuous acts of harassment; discrimination; retaliation; and [she] has been further subjected to a hostile work environment."  Compl. ¶ 52.  The one specific example she alleges is that Messrs. Hayes, Hua, and Griffin "blocked" her "attempts at promotion . . . on at least three (3) occasions."  *Id.*  The evidence describes one time Plaintiff sought a promotion: On Thursday, May 29 2008, at 3:57 p.m., Plaintiff emailed a "managerial potential" form to her first-line manager Mark Smith, asking him to complete it so that she could apply for a temporary senior management position that had been posted on May 27, 2008, with applications due Monday, June 2, 2008.  The form provided check boxes for a supervisor to rate an employee as "Ready Now," "Ready in 1 – 2 years," or "Ready in 3 – 5 years" for managerial responsibilities.  Plaintiff left work after sending the email and did not return until Wednesday, June 4, 2008.  Plaintiff called Smith on the morning of Friday, May 20, 2008, and they discussed her application.  Smith informed Plaintiff that she would have to sign the form before it was submitted, but that she could go ahead and

submit the rest of her application before the deadline, and the form would be accepted late, after she returned to the office.  Plaintiff testified that she was "working on the application" out of the office during that time "on purpose. . . to see how things transpired," and that she did not want to submit the application without the form because if her supervisors had not assessed her as "ready now," there would be "no meaning in applying."  Smith and Hua completed the form on Tuesday, rating Plaintiff as "Ready in 1 – 2 years."  Plaintiff, who had not received or reviewed the form, did not submit an application.  Rakesh Gupta, another employee who Plaintiff claims has less managerial experience, was selected for the position.  May 27, 2008 Job Posting, Def.'s Mem. Ex. 19, ECF No. 90-19; Managerial Potential Form, Def.'s Mem. Ex. 20, ECF No. 90-20; Smith Aff., Def.'s Mem. Ex. 21, ECF No. 90-21; May 29–June 3, 2008 Email Chain, Def.'s Mem. Ex. 22, ECF No. 90-22; Ruffin Dep. 74–89; Pl.'s Mot. ¶¶ 187, 198, 199, 203, 206.

In late June, an individual from the EEO Office called Smith and told him to discuss the Managerial Potential Form with Ruffin.  Smith Aff.  Plaintiff informed Smith that her prior supervisor previously had given her the "Ready Now" rating, and she provided that earlier form to Smith, along with "a two page employee narrative to describe her qualifications as a senior manager."  *Id.*  Based on that information, Smith revised his rating of Plaintiff to "Ready Now." He presented the form to Hua for signature in July 2008, but Hua "would not sign the updated form" because Ruffin's "narrative contained language that he considered inflammatory," and the previous form was signed incorrectly.  Hua agreed to meet with Plaintiff about making changes so that he would sign the form, but Plaintiff emailed Smith on July 17, 2008 "stating that she had no more communication to offer and that she would proceed to the next step of the EEO process."  *Id.*  According to Plaintiff, Hua signed the form in December 2008.  Pl.'s Mot. ¶ 197.

Plaintiff filed another EEO claim on October 1, 2008, alleging racial discrimination and retaliation based on her supervisors' delay in completing the form with the rating she thought she deserved.  Dep't of Treas. Revised Acceptance Ltr. for Oct. 1, 2008 EEO Claim 1, Def.'s Mem. Ex. 27, ECF No. 90-27.

## II.    ISSUES BEFORE THE COURT

In her Complaint, Plaintiff claims that "Defendants discriminated and retaliated against [her] in violation of Title VII by . . . [f]alsely accusing Plaintiff of substandard work product; . . . "[s]ubjecting Plaintiff to a hostile work environment; and/or . . . [s]uspending Plaintiff's employment," and that they "retaliated against her on account of her EEO filings."   Compl. ¶¶ 65–66.   Plaintiff's Complaint is, of course, limited to the issues she raised in her administrative claim.  *See Taylor v. Peninsula Regional Med. Ctr.*, ---- F. Supp. 2d ----, 2014 WL 936847, at *4 (D. Md. Mar. 10, 2014); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996) ("Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.").   Although Plaintiff filed multiple administrative claims, Plaintiff's Complaint, filed with the assistance of counsel, makes clear that the pending lawsuit relates to the administrative claim she initiated on September 27, 2007 and formally filed on December 31, 2007.  *See* Compl. ¶¶ 10–21.  That EEO claim, as amended, presented five issues:

> Was the complainant subjected to disparate treatment and a hostile working environment on the bases of her race (Black) and reprisal for prior EEO activity when:
>
> 1. On August 13, 2007, her supervisor announced that the selectee for a GS-15 position had been his "number one pick", and that she could learn whatever she needed to know from the Complainant;

2. On February 7, 2008, the Complainant was issued a decision to suspend her from duty for two (2) days, effective February 25 through 26, 2008;

3. On unspecified dates, one of her former managers and his subordinates were watching her and reporting back to her supervisor regarding her activities;

4. On an unspecified date, her supervisor spoke about her impending suspension with individuals who did not have a need to know about it; and

5. On May 1, 2008, the last page of her Suspension Decision Letter was left on the copier in public view in room B3-470.

Dep't of Treas. Ltr. to Ruffin re Dec. 31, 2007 EEO Claim (footnotes omitted).  However, in their memoranda filed with the court, the parties also discuss the viability of Plaintiff's claims based on her later EEO claim, in which she presented the following issues:

Was the Complainant subjected to discrimination based on her race (black) and reprisal for prior EEO activity when:

1. On or about July 2008, she received a rating of "Ready in one to two years" on her Form 13236, Managerial Potential Form, and

2. On or about August 2008, the second line manager refused to sign the Complainant's re-submitted Form 13236.

Dep't of Treas. Revised Acceptance Ltr. for Oct. 1, 2008 EEO Claim 1 (footnote omitted); *see* Pl.'s Opp'n 9; Def.'s Mem. 36.  I will consider the parties' summary judgment motions as they pertain to each of these claims.

## III.    STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).   If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to

the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* When considering cross-motions for summary judgment, "the court must view each motion in a light most favorable to the non-movant." *Linzer v. Sebelius*, No. AW-07-597, 2009 WL 2778269, at *4 (D. Md. Aug. 28, 2009); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

## IV.   DISCRIMINATION

### A. Failure to Exhaust Administrative Remedies

Defendant argues that Plaintiff failed to exhaust her administrative remedies with regard to her discrimination claim based on her non-selection in June 2007 because she did not contact an EEO counselor within forty-five days of when Le was selected instead of Plaintiff. Def.'s Mem. 17. It is true that an aggrieved individual must contact an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action," 29 C.F.R. § 1614.105(a)(1), unless the individual has a reasonable explanation for her delay, in which case the EEOC will extend the deadline, *id.* § 1604.105(a)(2). Specifically, "[t]he agency or the Commission shall extend the 45–day time limit in paragraph (a)(1) of this section . . . when the individual shows . . . [ii] that he or she did not know and reasonably should not have known that the discriminatory matter or personnel action occurred . . . ." 29 C.F.R. § 1614.105(a)(2); *see Jakubiak v. Perry*, 101 F.3d 23, 27 (4th Cir. 1996). Here, it is undisputed that Le's selection was a personnel action, and the effective

date on Le's selection was June 24, 2007. Ruffin Dep. 28; Request for Personnel Action, Def.'s Mem. Ex. 7, ECF No. 90-9. But, Plaintiff testified that she did not learn that Le had been picked until August 13, 2007. Ruffin Dep. 24:5–18; Pl.'s Mot. ¶ 31. Additionally, Plaintiff argues that she testified that Le did not begin to work in that position until late August 2007, Pl.'s Mot. 32, although Plaintiff does not identify or attach the relevant testimony. On this basis, I assume, *arguendo*, that Plaintiff's contact with an EEO counselor at the end of September 2007 was timely. *See* 29 C.F.R. § 1614.105(a)(2); *Jakubiak*, 101 F.3d at 27.

### B. Prima Facie Case

To establish a prima facie case of race, color, or gender discrimination, Plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) less favorable treatment than similarly situated employees outside the protected class." *Linton v. Johns Hopkins Univ. Applied Physics Lab.*, LLC, No. JKB–10–276, 2011 WL 4549177, at *5 (D. Md. Sept. 28, 2011) (citing *White v. BFI Waste Servs.*, 375 F.3d 288, 295 (4th Cir. 2004)); *see Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011). If Plaintiff makes this showing, "then the burden of production shifts to the employer to proffer a legitimate reason for the alleged discriminatory action." *Linton*, 2011 WL 4549177, at *5 (citing *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973))). If Defendant does so, then Plaintiff "must demonstrate that the employer's proffered reasons were merely a pretext for discrimination." *Id*. Summary judgment in Defendant's favor is appropriate if Plaintiff "fails either to make a prima facie case or to rebut the employer's proffered explanation of its actions." *Id*.

It is undisputed that Plaintiff, a "black African American female," is a member of a protected class. Compl. ¶ 64; Def.'s Mem. 23. It also is undisputed that Plaintiff's non-selection

in June 2007 and her two-day suspension in February 2008 constitute adverse employment actions. Def.'s Mem. 23, 33; Pl.'s Opp'n 8–9. I first will consider whether any of the other allegedly-adverse employment actions could form the basis for Plaintiff's discrimination claim.

"An adverse employment action is a discriminatory act which adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir.) (citations and quotation marks omitted). "Typically, an adverse employment action has been found in cases of 'discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion.'" *Barrett v. Bio-Medical Applications of Maryland, Inc.*, No. ELH-11-2835, 2013 WL 1183363, at *18 (D. Md. March 19, 2013) (quoting *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999)). The act need not be an "'ultimate employment decision,'" *James*, 368 F.3d at 375–76 (citation omitted), but the effect must be tangible, *id.* at 377. This element "ensures that employees do not use Title VII to provide 'redress for trivial discomforts endemic to employment.'" *Matthews v. Bd. of Educ. of Howard Cnty.*, No. GLR-12-1758, 2013 WL 3506922, at *3 (D. Md. July 10, 2013) (quoting *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006)). Simply put, "'Title VII does not remedy everything that makes an employee unhappy.'" *Wright v. Kent Cnty. Dep't of Soc. Servs.*, No. ELH-12-3593, 2014 WL 301026, at *14 (D. Md. Jan. 24, 2014) (quoting *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 329 (D. Md. 2003)).

Hua's announcement that Le was his "number one pick" and that Le could learn her job skills from Ruffin, who was not selected, did not have a tangible effect on "terms, conditions, or benefits of the plaintiff's employment." *See James*, 368 F.3d at 375. Rather, it was Ruffin's non-selection for the position that actually affected the terms of Ruffin's employment.

Likewise, Hua's purported statements about Plaintiff's suspension, while perhaps insensitive, and Quattlebaum's failure to remove from the photocopier a page of the letter notifying Plaintiff of the decision to suspend her, which may have been careless and regrettable, did not affect Plaintiff's employment in a tangible manner.   Additionally, to the extent that her colleagues purportedly observed her behavior and reported it to her supervisor, Plaintiff has not shown that their observations or reports tangibly impacted her employment.   Consequently, none of these actions amounted to an adverse employment action.  *See id.*

As for her supervisors' initial assessment of Plaintiff as "Ready in one to two years" on the Managerial Potential Form, and Hua's delay in signing that form, neither is an adverse employment action either.  *See id.*   This is because an evaluation of potential, like a performance rating, "does not in itself constitute an adverse employment action. 'Rather, it is a mediate step, which, if relied upon for a true adverse employment action (e.g., discharge, demotion, etc.) becomes relevant evidence.'"  *Jeffers*, 264 F. Supp. 2d at 330; *see Wright*, 2014 WL 301026, at *14.  Indeed, the Managerial Potential Form is a form used in determining whether an applicant is qualified for a position and, during the time in which Plaintiff was rated "Ready in 1 – 2 years" instead of "Ready Now," and the period in which Hua delayed in signing the form, it is undisputed that Plaintiff never applied for a position.  Smith Aff.; Ruffin Dep. 74–89.  Thus, neither act prevented Plaintiff from obtaining a promotion or otherwise affected the terms or conditions of her employment.  *See Jeffers*, 264 F. Supp. 2d at 330 (no adverse employment action where employer "never used . . . 'unacceptable' performance rating to [employee's] detriment"); *see Wright*, 2014 WL 301026, at *14 ("An unsupported suggestion that a negative review dating from mid–2009 might have affected future opportunities, including a position for which plaintiff interviewed two and a half years after the review, does not amount to a plausible

allegation that [the employer] used the 2009 evaluation 'as a basis to detrimentally alter the terms or conditions' of plaintiff's employment."); *James*, 368 F.3d at 377 ("Inasmuch as James departed the company before he even came up for promotion, we are left to guesswork and conjecture as to what his prospects would have been. James' speculations about the impact of his reassignment on his opportunities for professional development are merely that-stark assertions that are not sufficient to survive summary judgment.").

In her Complaint, Plaintiff also lists "[f]alse[] accus[ations] . . . of substandard work product," Compl. ¶ 65, as a basis for her discrimination claim. Assuming *arguendo* that this claim could be "developed by reasonable investigation of the original complaint" before the EEOC, *see Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996), Plaintiff nonetheless cannot make out a prima facie case of discrimination based on this action. Criticism, or a reprimand, only constitutes an adverse employment action if it "'works a real, rather than speculative, employment injury'" and does more than "'bruise[] an employee's ego or reputation'" *Matthews*, 2013 WL 3506922, at *3 (quoting *Lewis v. Forest Pharm., Inc.*, 217 F. Supp. 2d 638, 648 (D. Md. 2002)). If all reprimands were adverse employment actions, "it would 'unduly inhibit criticism of employees, which is a normal incident of the working relationship between supervisors and those in their charge.'" *Id*. at *4 (quoting *Lewis*, 217 F. Supp. 2d at 648). Thus, as Plaintiff has not shown any "real . . . employment injury" from these alleged statements that Plaintiff's work product was "substandard," the statements cannot constitute an adverse employment action. *See id*. at *3. In sum, Plaintiff's non-selection in June 2007 and her two-day suspension in February 2008 are the only adverse employment actions with regard to which Plaintiff may have established a prima facie case of discrimination.

*1. Non-selection in June 2007*

The evidence shows that Plaintiff's job performance was satisfactory when she was not selected for the position in June 2007. *See* Smith Decl. Ex. A, at 7, 13, Def.'s Mem. Ex. 32, ECF No. 90-32 (Ruffin received IRS Performance Award in 2004, 2005, 2006; Manager's Award in 2004; and a job performance award in "all years of employment with federal government"; annual rating stated that Ruffin "[e]xceeded" performance expectations in 2005); Griffin Decl. ¶ 3 & Ex. 1 (noting that, in his February 2008 decision to suspend Ruffin, he concluded that she was "a strong IRS performer and valued employee" based on her "most recent . . . performance evaluation," in which she "EXCEEDED," and her "absence of prior disciplinary actions"). Additionally, Le, an Asian-American, who had similar qualifications to Plaintiff, was selected for the position for which Plaintiff was not selected.   Smith Decl. ¶¶ 3, 5–7 & Exs. A & B. Therefore, Plaintiff has shown that she was treated differently from a similarly-situated employee outside the protected class and thereby established a prima facie case of race discrimination based on her non-selection for a position in June 2007. *See Linton*, 2011 WL 4549177, at *5.  Indeed, Defendant does not challenge whether Plaintiff established a prima facie case, arguing instead that it "has articulated a legitimate non-discriminatory reason for the selection of Loan Le over Ruffin."  Def.'s Mem. 18.

Thus, the burden shifts to Defendant "to proffer a legitimate reason for the alleged discriminatory action." *Linton*, 2011 WL 4549177, at *5.  Defendant attaches a declaration from Mark Smith, Plaintiff's "first-line supervisor," and "the ranking official for the selection of the GS-15 IT specialist position for which Loan Le was the successful applicant."  Smith Decl. ¶ 3. Smith states that, "[w]hile [he] thought both candidates had very strong skillsets and both were qualified, Ms. Le had the edge in [his] assessment on both technical abilities and technical

leadership as exhibited in the background [he] was provided." *Id.* ¶ 5.  He ranked Le higher than Ruffin based on the "Knowledge, Skills, and Abilities listed in the announcement." *Id.* ¶ 4. Smith opined that "Ms. Le's application revealed a stronger technical expertise, giving her the stronger overall edge for the specific job position," and that Le's application showed that she had a stronger "ability to partner and collaborate with diverse of owners and stakeholders on project teams involving the successful delivery of re-engineered business processes or re-designed systems." *Id.* ¶¶ 5–6.  He concluded that "Ms. Le was the best qualified candidate." *Id.* ¶ 7.

Defendant also attaches a declaration from Erika Carter, "a GS-15 Management/Program Analyst" who "worked in the Portal Program management front office as an assistant to Cecil Hua" and "was a member of the interview panel."  Carter Decl. ¶¶ 2–3, Def.'s Mem. Ex. 33, ECF No. 90-33.  She states that "Loan Le was the top candidate," explaining that she "believed that Loan Le was the superior candidate because during the interview[,] Ms. Le demonstrated confidence, strong technical abilities, and customer service skills which were needed for the position." *Id.* ¶¶ 4 & 6.  In addition, Defendant attaches a declaration from Francis A. Granito, a Supervisory Program Manager who "was a member of the interview panel."  Granito Decl. ¶¶ 2–3, Def.'s Mem. Ex. 34, ECF No. 90-34.  He states that he "believed Loan Le was the superior candidate on the basis of her strong interview which clearly validated her experience." *Id.* ¶ 6.

Finally, Defendant attaches a declaration from Cecil Hua, who "was the deciding official for the selection of the GS-15 IT Specialist position for which Loan Le was the successful applicant."  Hua Decl. ¶ 3, Def.'s Mem. Ex. 35, ECF No. 90-35.  Hua stated that "[t]he interview panel held interviews and determined that Loan Le was the best candidate" and "reported this back to [Hua]." *Id.* ¶ 7.  Thus, Defendant has shown that it had a legitimate, non-discriminatory reason for selecting Le over Ruffin. *See Linton*, 2011 WL 4549177, at *5.

Consequently, the burden now shifts back to Plaintiff to demonstrate that Defendant's "proffered reasons were merely a pretext for discrimination." *Id*. "The final pretext inquiry merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination, which at all times remains with the plaintiff." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (internal quotations omitted). Plaintiff argues that "[t]he selection panel was tainted by Frank Granito," against whom she previously had filed an EEO claim. But that claim, filed in November 2004, well over two years earlier, was too temporally distant for her non-selection in June 2007 to be a retaliatory act. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'") (citation omitted); *Alexander v. Glut Food Coop*, No. 10–cv–955–AW, 2012 WL 4846759, at *4 (D. Md. Oct. 10, 2012) ("Absent additional evidence probative of causation, temporal proximity of three-and-a-half months is insufficient to support the inference that the protected activity caused the adverse act."). It certainly does not establish pretext.

Plaintiff also claims that the panel members' connections to Hua prompted them to discriminate against her. This is mere speculation, which is insufficient to establish pretext. *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008). Additionally Carter declared that "Mr. Hua did not select the panel" and "he had no interaction with the panel on this announcement until [the panel] reported back to him that [they] believed Ms. Le was the best candidate." Carter Decl ¶ 7; *see* Granito Decl. ¶ 7 (same). And, Hua stated that he "did not select the persons to sit on the interview panel" and "had no interaction with the panel." Hua

Decl. ¶¶ 4-5. Rather, "[t]he panel independently interviewed the applicants and advised [Hua] as to whom they believed was the best candidate," and Smith also "did a ranking and advised [Hua] that he believed Loan Le was the best candidate." *Id*. ¶¶ 5-6. Thus, Plaintiff has failed "to rebut the employer's proffered explanation of its actions," and therefore summary judgment in Defendant's favor is appropriate on Plaintiff's discrimination claim based on her non-selection in June 2007. *See Linton*, 2011 WL 4549177, at *5.

    *2. Two-day suspension*

As noted, Plaintiff has established that she received annual performance awards. Smith Decl. Ex. A, at 7. Yet, Defendant has shown that, when it investigated the issues concerning the use of TechSolutions's proprietary information and the dissemination of confidential information, it concluded that Plaintiff attempted to obtain proprietary information and did not properly safeguard employees' confidential information, in violation of Defendant's standards for ethical conduct. Griffin Decl. ¶ 3 & Att. A. Consequently, a genuine dispute exists as to whether Plaintiff's job performance was satisfactory when she was suspended in February 2008.

A genuine dispute also exists regarding whether Defendant treated Plaintiff differently from similarly-situated employees who were either male or not African-American. In Plaintiff's view, the mistakes she allegedly made were mistakes that other IRS employees made repeatedly without consequences. Pl.'s Opp'n 3–4, 12. In support, Plaintiff attaches news articles about the "IRS fail[ing] to adequately protect its networks," and alleges that "no one [was] held accountable." *E.g.*, Apr. 8, 2008 GovExec.com Newsletter, Pl.'s Opp'n Ex; Jim Abrams, *Report finds IRS computer security flaws*, Yahoo! News (Apr. 7, 2008), http://news.yahoo.com/s/ap/20080407/ap_on_bi_ge/irs_computer_security, Pl.'s Opp'n Ex.; Brian Fung, *The IRS Mistakenly Exposed Thousands of Social Security Numbers*, National

Journal (July 9, 2013), http://news.yahoo.com, Pl.'s Am. Ex., ECF No. 101-3.   However, as Defendant notes, these news article do not show whether the individuals responsible for the breaches were outside the protected class or similarly situated to Plaintiff.   Nor do they show that their actions were without consequences.   Rather, an IRS publication that Plaintiff attached to her Opposition states that, "[i]n 2013, 272 UNAX [unauthorized access] violations were investigated," and "[a]s a result, 18 employees resigned, 15 employees were removed, 39 employees were suspended, 6 employees were prosecuted, 41 employees were cleared and 153 had other administrative actions taken." Introduction to UNAX: Briefing for IRS New Employee, Pl.'s Opp'n Ex.

Nonetheless, in her Answers to Declaration Questions posed by the EEOC, which she provided under penalty of perjury, Plaintiff said that Hua "overlooks the failures of all members of his staff except [her]." Ans. to Decl. Questions 5, Def.'s Mem. Ex. 37, ECF No. 90-37.  In her view, she is "being held to a different standard and punished in this TIGTA action for things that others . . . are allowed to get to do as normal operating procedure." *Id.* at 6.  Specifically, she declares that "Reid Goldman has had several failures relative to the protection of data and security standards," but "is not being held accountable now or in the past at all."  She states that Goldman "did not ensure that security LEM checkers were applied to the many servers there where taxpayer data resides," and "he allowed uncertified applications to exist for over five years." *Id.*   She also asserts that "John Langston was allowing root access to taxpayer and privacy data infrastructure by contractors," yet he "purposely was not interviewed in the TIGTA complaint." *Id.* at 7.

Assuming *arguendo* that, through her Answers to Declaration Questions, Plaintiff sufficiently has established a prima facie case of discrimination based on race or gender

stemming from her two-day suspension, Defendant has shown that it had a legitimate, non-discriminatory reason for suspending Ruffin—the same reason that makes Plaintiff's job performance questionable.   The TIGTA's two-year investigation concluded that Plaintiff "allowed unauthorized access to the [Visual Powerfiles] database and in doing so, allowed unauthorized persons to access confidential and Privacy Act information on IRS employees," and that she "conspired with other IRS staff in efforts to obtain [Visual Powerfiles] source code for STG developers to use in the development of the competitive product," which were "violation[s] of the Treasury Standards of Ethical Conduct and the Privacy Act." ROI 153. Likewise, in considering whether the Treasury Department should take any administrative action, Hua concluded that Ruffin had allowed unauthorized individuals to access IRS employees' confidential information; improperly used the Visual Powerfiles database to develop the EEODB; and aided Green's attempt to obtain TechSolutions's proprietary information.  Oct. 3, 2007 Notice of Proposed Suspension.   And, Griffin ultimately concluded that, although Plaintiff did not provide actual employee data "to outside contractor employees," she was "careless" and "failed to adequately protect employee personal information."   Griffin Decl. Att. A, at 112-13.  He also found that Plaintiff "supported efforts to utilize proprietary source code and data schemas despite IRS policies . . . and vigorous TechSolutions resistance."  *Id.* at 114. These are legitimate, non-discriminatory reasons for a two-day suspension.  *See Linton*, 2011 WL 4549177, at *5. Because Plaintiff has not rebutted this explanation, summary judgment in Defendant's favor is appropriate on Plaintiff's discrimination claim based on her suspension. *See Linton*, 2011 WL 4549177, at *5.

V.      HARASSMENT

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin." 42 U.S.C. § 2000e-2(a)(1).  To be actionable under 42 U.S.C. § 2000e-2(a)(1), discrimination need not be "economic" or "tangible." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citations and quotation marks omitted).  Rather, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986) (internal brackets and quotation marks omitted)).  To establish a prima facie case of hostile work environment based on race or sex or color, a plaintiff must show that she was subjected to "'offending conduct'" that (1) "'was unwelcome,'" (2) "'was because of'" her sex or race, (3) "'was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment,'" and (4) "'was imputable to her employer.'" *Westmoreland v. Prince George's Cnty., Md.*, 876 F. Supp. 2d 594, 614 (D. Md. 2012) (quoting *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011)) (discussing sex-based harassment) (internal citation and quotation marks omitted)); *see EEOC v. Xerxes Corp.*, 639 F.3d 658, 668–69 (4th Cir. 2011) (discussing race-based harassment); *Banhi v. Papa John's USA, Inc.*, No. RWT–12–665, 2013 WL 3788573, at *8 (D. Md. July 18, 2013) (same).

The hostility must be both objective and subjective; i.e., it must be such that it "would reasonably be perceived [by a reasonable person], and is perceived [by Plaintiff], as hostile or abusive." *Harris*, 510 U.S. at 22.  "Factors going to the severity and pervasiveness of

discriminatory harassment include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Banhi*, 2013 WL 3788573, at *8 (quoting *Harris*, 510 U.S. at 23); *see Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (same).

EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008), set a "'high bar'" that a plaintiff must clear to establish that the offensive conduct was sufficiently severe and pervasive:

> Intermittent acts of harassment are insufficient to establish that a hostile work environment is severe or pervasive. Indeed, Title VII does not mandate civility in the workplace. Further, a supervisor's strict management style or degree of supervision is not evidence of actionable harassment. However, a work environment can be considered hostile if it is "consumed by remarks that intimidate, ridicule, and maliciously demean the status of [a protected group]."

*Engler v. Harris Corp.*, No. GLR-11-3597, 2012 WL 3745710, at *5 (D. Md. Aug. 28, 2012) (internal citations omitted). Notably, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted); *Romeo v. APS Healthcare Bethesda, Inc.*, No. WDQ-11-2208, 2012 WL 1852264, at *9 (D. Md. May 17, 2012) (quoting *Faragher*). Rather, "courts usually only allow hostile work environment claims to proceed where the discriminatory abuse is near constant, oftentimes of a violent or threatening nature, or has impacted the employee's work performance." *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 777 (D. Md. 2010).

Defendant contends that Plaintiff's "complaint in this Court is silent about harassment," as are her answers to interrogatories, and although her EEO claim includes harassment allegations, none of her allegations has to do with race, and they are not severe and pervasive. Def.'s Mem. 41. It is true that Plaintiff does not allege any specific harassment in her Complaint

or her Motion for Summary Judgment.  Additionally, many of the allegations she makes in her Opposition to Defendant's Motion for Summary Judgment, which is unsigned and unsworn, are unsubstantiated and will not be considered.  *See* Fed. R. Civ. P. 56(c)(1)(A).  But, there is evidence of what she perceives as harassment in her deposition testimony, emails, her answers to interrogatories, and her response to the Declaration Questions that the EEOC posed regarding Plaintiff's hostile work environment claim, and which Plaintiff signed under penalty of perjury. *See* Ans. to Decl. Questions 2–9.

Plaintiff's allegations can be grouped into two categories: alleged harassment by supervisors and alleged harassment by co-workers.  With regard to her co-workers' actions, Plaintiff declares that Erika Carter, a management analyst who also worked for Hua, "started mentioning TIGTA to [Plaintiff] during visits to [Plaintiff's] desk after the notice of suspension," sent Plaintiff "job announcements . . . including TIGTA and secretary positions," and did not include Plaintiff on "invitations to All Hands[9] meetings."  Ans. to Decl. Questions 4.  She states that Carter would "start inflammatory conversation[s]" with Plaintiff "to get [Plaintiff] to say something incriminating."  *Id.*  She asserts that she experienced "personal affronts" from her former co-worker John Langston "on several occasions," such as when he "said out loud [in Plaintiff's vicinity] that people think they can get away and not have to pay for what they do." *Id.* at 7.  She refers to "male cronyism" between her former co-workers Jeffrey Fletcher and John Langston and Rakesh Gupta and Frank Granito.  *Id.*

Plaintiff states that Fred Wade, an executive assistant, made comments to her that "this place is sensitive and private," told her that she did not "belong here," and "referred to [her] as trouble."  Ans. to Decl. Questions 3.  She testified that Wade said to her: "Don't you know

---

[9] Plaintiff does not explain what "All Hands" meetings were.

anything? Don't you know that you shouldn't be messing with privacy data and privacy information?"   Ruffin Dep. 62:1-6.   She asserts that another contractor, Mike Kelty, also "referred to [her] as trouble" and made "affronting comments," such as saying that he and other colleagues were "plotting."   Ans. to Decl. Questions 3.   She claims that personnel administration staff member Sheila Quattlebaum also "referred to [her] as trouble on several occasions."   *Id.* at 9.

According to Plaintiff, another personnel administration staff member, Paula Ray, "affront[ed]" Plaintiff "when she issued the suspension letter," insulted Plaintiff when Plaintiff "inquired about submitting FOIA requests," "exhibited animosity toward [Plaintiff]," and "seem[ed] to delight in and foster[] [some of] the problems" that Plaintiff had at work.   *Id.* However, she claims that Ray's actions were a response to Plaintiff's suspension, rather than alleging that they were "'because of'" Plaintiff's race or gender.   Therefore, she has not established a prima facie case of harassment based on Ray's actions.   *See Westmoreland*, 876 F. Supp. 2d at 614 (quoting *Hoyle*, 650 F.3d at 331).

Plaintiff also alleges that "TIGTA agent, Rodney A. Davis, prepared a very biased and baseless investigation that is steered toward the defamation of Evelyn Brooks Ruffin only."   Ans. to Decl. Questions 8.   She said that she "*suspect[s]*" that Davis and other agents "and executives are members of a black male fraternity that has a grudge against [her] for reporting then to the federal authorities for invasion of privacy, conspiracy and sexual defiance."   *Id.* (emphasis added).   Yet, "[m]ere speculation or the building of one inference upon another" does not "create a genuine issue of material fact" for purposes of defeating a motion for summary judgment. *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008).   And, as with Ray's actions, Plaintiff views Davis's actions as retaliatory, rather than discriminatory based on race or gender, such that

they cannot form the basis for a prima facie case of discriminatory harassment.  *See Westmoreland*, 876 F. Supp. 2d at 614; *Hoyle*, 650 F.3d at 331.

Moreover, Ray and Davis and the alleged fraternity members, as well as Carter, Langston, Wade, Kelty, and Quattlebaum, are government employees who, at one time may have been Plaintiff's co-workers, but Plaintiff has not demonstrated that any one of them was Plaintiff's supervisor at the time of the alleged harassment.  "In a case where an employee is . . . harassed by a coworker . . . , the employer may be liable only 'if it knew or should have known about the harassment and failed to take effective action to stop it.'"  *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006) (quoting *Ocheltree v. Scollon Prod.*, 335 F.3d 325, 334 (4th Cir. 2003)). Plaintiff has not shown that Defendant knew or should have known about her co-workers' allegedly-harassing actions, and therefore she has not established a prima facie case of harassment based on their actions.  *See id.*

Plaintiff also claims that "Reid Goldman, Frank Granito and Kevin Acoveno made false, defaming [statements] or did not tell the complete truth when interviewed by TIGTA agent in the EEODB investigation."  Ans. to Decl. Questions 6.  She alleges that they tried to "take away [her] responsibilities," and that Goldman in particular "was very confrontational toward [her] . . . and made it clear he wanted to ensure a white male became Section Chief [and] that no on[e] else had a chance at the job of which [she] was a contender."  *Id.*  She claims that "Goldman is [a] very exclusionary professional and does not like working for or with Afro-Americans and treats you as though you could not possibly have anything to offer." *Id.* at 7.  Plaintiff testified that Acoveno said that his "wife is the head of HR, and [they] decide where the slaves were going to go that didn't belong in the division."  Ruffin Dep. 44:24 – 45:3. Yet, Plaintiff has not shown that Goldman and Acoveno were her supervisors or that Defendant knew or should have known

27

about their statements to her.  Consequently, she has not established a prima facie case of harassment based on Goldman's or Acoveno's actions.  *See Howard*, 446 F.3d at 565.

With regard to Granito, Plaintiff attaches an email she sent to Quattlebaum on August 10, 2005, in which she informed Quattlebaum that on August 3, 2005, Granito called her a "low down, No good, Piece of Shit" and made a hand gesture at her which consisted of "putting up the three middle fingers of his left had [sic]." Aug. 10, 2005 Email, Pl.'s Opp'n Ex.

Plaintiff also states that her supervisor Hua told her, "with a very big grin on his face" and "in front of his executive assistant" and Le, that Le "was his special number one selection for a GS15 position." Ans. to Decl. Questions 2; Ruffin Dep. 21:8-13, 24:1-3 & 23-25.  She asserts that Hua "blocked [her] appointment to every GS15 [position] in [her] group."  Ans. to Decl. Questions 2; Ruffin Dep. 21:20-21. Plaintiff testified that Hua "only promotes Asians in his division" and "[n]o African American has ever been promoted under Cecil Hua."  Ruffin Dep. 23:16-20.  According to Plaintiff, "Hua seems to be displeased by any work product successes that [Ruffin] accomplish[es]."  Ans. to Decl. Questions 3.  Hua "is quick to ignore any positive feedback about [her] and "wants to promote everyone but [her] based on a biased and unfair personnel action that he used to block [her] upward mobility."  *Id.* at 5; *see id.* at 11–12.

Plaintiff declares that, while she gave a tour of the contractor cyber center to a technical director, Hua "asked the tour guide if they stored any data for the Department of Justice Criminal Investigation Division," which Plaintiff perceived as a reference to the "TIGTA and DOJ matter [she was] involved in."  Ans. to Decl. Questions 5.  According to Plaintiff, "Hua lied to [her] . . . when he said that Department of Justice (DOJ) had found grounds to prosecute [her] and others based on TIGTA investigation," and "Hua claimed the investigation was closed and could not be reopened so [Ruffin] would not ask for further investigation based on [her] side of the story."  *Id.*

She states that, with Hua as her supervisor, she is "treated differently from all other nationalities," and "Hua seems to get enjoyment out of this action." *Id.* at 11.  Plaintiff feels that Hua "taunts [her] with questions about how [she] feel[s]." *Id.*

According to Plaintiff, Hua and her former supervisor Melvin Hayes "have exhibited a desire to keep Afro American Project Managers out of PPMO" and have viewed African-Americans as "unacceptable no matter how well [they] performed."  Ans. to Decl. Questions 12. Plaintiff testified that Hayes "said [she] was never to work in their division." Ruffin Dep. 44:18-19.  Plaintiff is "convinced" that Hua's attitude toward her must be because of her race because "he had no knowledge of [her] before coming to PPMO [Portal Program Management Office]." Ans. to Decl. Questions 11.  She states that she "suppose[s]" that, because she is African-American, she "was being forced on" Hua and Hayes as an employee. *Id.* at 12.

Plaintiff testified that Hayes "began a vendetta to get rid of [her]" after she was assigned to his division "because he didn't want [her] there to begin with," and "he would follow [her] . . . and he was watching his watch to see where [she] was going and what [she] was doing."  Ruffin Dep. 39:1-6.  Plaintiff recalled that Hayes followed her "periodically" from March to December 2007; she elaborated that during that time, he followed her "at least three times." *Id.* at 45:5. One time, "[h]e left his cubicle at the same time" as her and "was walking behind [her]"; the second time, Plaintiff "got up from [her] desk" and "he got up and he walked out"; and the third time, she "sensed him," although she did not "actually look to see it was him," and he "followed [her] downstairs," at which point she saw him "looking at his watch like he wanted to know what time and where [she] was going." *Id.* at 47:23 – 48:3, 49:7-10, 52:11-14, 53:18-20, 54:8-19. Plaintiff testified that Hayes announced to a group of employees, while looking at Plaintiff: "I'm going to have to determine which one of you I'm going to have to fire." *Id.* at 104:14-18, Jan.

13, 2014, Def.'s Mem. Ex. 2.  Plaintiff submitted an email she sent herself in February 25, 2009, in which she documented that she "saw Melvin Hayes and Mitch Chazan in halls in huddle" that morning.  Feb. 25, 2009 Email, Pl.'s Opp'n Ex.  In an email she sent to herself on April 6, 2009, she observed that "Hayes often talks about getting people or getting someone fired."  Apr. 6, 2009 Email, Pl.'s Opp'n Ex.  He has poor working relationships with many employees that have been under his supervision."

She emailed herself on September 26, 2007 that Hayes and Gupta were "reporting [her] daily activity to Cecil Hua."  Sept. 26, 2007 Email, Pl.'s Opp'n Ex.; *see* Ruffin Dep. 39:7 – 40:2. She states that they "have been watching and listening to [her] actions and conversation[s] since [she] moved back to PPMO" in February 2007 and "look[ing] for any incidents to report to Cecil Hua that he can use against [Plaintiff]."  Ans. to Decl. Questions 4-5; Pl.'s Ans. to Interrogs. 6. Additionally, she alleges that Hayes and Gupta "have tried to impede [her] performance of work" and "refused to assist" her.  Ans. to Decl. Questions 5.

Plaintiff states that she "suffered mental anguish, including stress, insomnia, and nausea as a result of Defendant[']s acts and omissions," as well as "physical pain from stress," for which she "has used pain relievers."  Pl.'s Ans. to Interrogs. 9.

As noted, Plaintiff's unsubstantiated suspicions that her supervisors' actions were based on her race or gender are not sufficient to defeat summary judgment.  *See Othentec Ltd.*, 526 F.3d at 140.  And, to the extent these allegations pertain to co-workers rather than supervisors, Plaintiff has not shown that they should be imputed to her employer.  *See Howard*, 446 F.3d at 565.  Regarding the remaining alleged actions for which there is at least a modicum of evidentiary support, few, if any, of these actions are based on race or gender.  Moreover, none of these actions could be called "physically threatening," and, even taken together, they were not

"'sufficiently severe or pervasive'" to be actionable.  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–23 (1993) (citation omitted); *see Westmoreland v. Prince George's Cnty., Md.*, 876 F. Supp. 2d 594, 614 (D. Md. 2012); *Banhi v. Papa John's USA, Inc.*, No. RWT–12–665, 2013 WL 3788573, at *8 (D. Md. July 18, 2013).   Plaintiff certainly has not shown that these acts intimidated or demeaned in a way that objectively "consumed" her working environment, *see Engler v. Harris Corp.*, No. GLR-11-3597, 2012 WL 3745710, at *5 (D. Md. Aug. 28, 2012), or that their frequency was at a "near constant" level, *see Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 777 (D. Md. 2010).   Additionally, these actions did not affect Plaintiff's work performance; her 2008 and 2009 performance evaluations stated that she "exceeded expectations," and her 2010 evaluation stated that her work was "outstanding."   Ruffin Dep. 110:18–24, Jan. 13, 2014.   Consequently, Plaintiff has not established a prima facie case of discriminatory harassment.  *See Harris*, 510 U.S. at 21–23; *Westmoreland*, 876 F. Supp. 2d at 614; *Banhi* , 2013 WL 3788573, at *8; *Engler*, 2012 WL 3745710, at *5; *Tawwaab*, 729 F. Supp. 2d at 777.

## VI.    RETALIATION

42 U.S.C. § 2000e–3(a) provides that it is unlawful for an employer "to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." Although "[t]he plain meaning of the statutory language provides protection of an employee's opposition activity when the employee responds to an actual unlawful employment practice," the Fourth Circuit has "[r]ead[ ] the language generously to give effect to its purpose" and "held that opposition activity

is protected when it responds to an employment practice that the employee reasonably believes is unlawful." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006).

To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that (1) she "'engaged in protected activity,'" (2) the employer "'took adverse action against [her],'" and (3) "'a causal relationship existed between the protected activity and the adverse employment activity.'" *Westmoreland*, 876 F. Supp. 2d at 612 (quoting *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)). As with discrimination claims, "the *McDonnell Douglas* burden-shifting framework applies." *Foster v. Univ. of Md. E. Shore*, 908 F. Supp. 2d 686, 705 (D. Md. 2012).

As for the first element, Plaintiff has established that she engaged in a protected activity: She filed an EEO claim against Granito in late 2004, an EEO claim against Hayes in November 2006, and an EEO claim against Chazan in December 2006. Granito Decl. ¶ 8 & Ex. A ¶ 20; Resolution Agr. for Nov. 23, 2004 EEO Claim, Def.'s Mem. Ex. 39, ECF No. 90-39; Pl.'s Ans. to Interrogs. 9 (referencing Compl. ¶¶ 42–53). She also filed an EEO claim in December 2007. Dep't of Treas. Ltrs. to Ruffin re Dec. 31, 2007 EEO Claim.

With regard to the second element, to establish an adverse employment action in a retaliation claim,

> "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" To illustrate, the Supreme Court has described "[a] supervisor's refusal to invite an employee to lunch" as a trivial, non-materially adverse action, but has said that "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement," is conduct that "might well" be materially adverse.

*Madock v. McHugh*, No. ELH-10-2706, 2011 WL 3654460, at \*26 (D. Md. Aug. 18, 2011) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 69 (2006) (citations and quotation marks omitted)).   This standard "is less 'strenuous' than the standard in a discrimination claim," because "[t]he adverse employment action in a retaliation case need not affect an employee's 'terms or conditions of employment.'"  *Id*. (quoting *Burlington N.*, 548 U.S. at 70).  Indeed, "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment related retaliatory acts and harm."  *Burlington N.*, 548 U.S. at 67.  Even with this lower bar, none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee "AWOL"; or issuing a personal improvement plan, "an 'Attendance Warning,'" a verbal reprimand, "a formal letter of reprimand," or "a proposed termination."  *Rock v. McHugh*, 819 F. Supp. 2d 456, 470–71 (D. Md. 2011).

It is undisputed that Defendant took adverse action against her when it did not select her for the position in June 2007 and when it suspended her for two days in February 2008, as previously discussed.  Notably, the adverse action was the February 2008 suspension itself and not the previously-issued May 2007 letter proposing a suspension.  *See Rock*, 819 F. Supp. 2d at 470–71.  Also, statements that Plaintiff's work product was substandard, Hua and Smith's underrating of Plaintiff on the Managerial Potential Form, and Hua's refusal to sign the revised Managerial Potential Form are akin to "failing to issue a performance appraisal" or issuing a reprimand and certainly less material than a proposed termination, all of which are insufficient to constitute an adverse employment action.  *See id.*  Additionally, despite the less-strenuous standard, neither an announcement that someone other than Plaintiff was her supervisor's

"number one pick" for the position she sought, nor statements to others about Plaintiff's suspension, nor the accidental failure to remove from a photocopier a page of the letter notifying Plaintiff of the decision to suspend her would dissuade a reasonable employee from filing a discrimination claim.  Likewise, co-workers' actions in observing and reporting an employee's behavior to a supervisor would not discourage a reasonable employee from filing a discrimination claim.  Thus, none of these actions is an adverse employment action for purposes of establishing a retaliation claim.  *See id.*; *Madock*, 2011 WL 3654460, at *26.  Consequently, even though the actions need not affect the terms or conditions of Plaintiff's employment, the only actions that constitute adverse employment actions for purposes of Plaintiff's retaliation claim are her non-selection in June 2007 and her suspension in February 2008.

As discussed with regard to Plaintiff's discrimination claim, Defendant has established a legitimate reason for each of these adverse employment actions, and Plaintiff has not shown that Defendant's reasons were pretextual.  Therefore, assuming *arguendo* that Plaintiff can establish a causal relationship between the protected activity and the adverse employment actions, summary judgment nevertheless is appropriate with regard to Plaintiff's retaliation claim.  *See Foster*, 908 F. Supp. 2d at 705.

## VII.    CONCLUSION

In sum, for the reasons stated above, Plaintiff's Motion for Summary Judgment, ECF No. 86, IS DENIED, and Defendant's Motion for Summary Judgment, ECF No. 90, IS GRANTED. The Clerk is directed to CLOSE THIS CASE.  So ordered.

Dated: <u>September 29, 2014</u>                              <u>        /S/                    </u>
                                                                         Paul W. Grimm
                                                                         United States District Judge

lyb